Mary McNamara, SBN 147131
August Gugelmann, SBN 240544
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 477-3800
Facsimile: (415) 477-9010

Attorneys for Defendant ARMAN DANIELIAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br>                       Plaintiff, <br> v. <br> ARMAN DANIELIAN, <br>                       Defendant. | Case No. CR 15-0234 CRB <br><br> **DEFENDANT'S SENTENCING MEMORANDUM** |

Arman Danielian was arrested on May 6, 2015 – seven years to the day before his sentencing hearing. He has been on continuous supervision and subject to restrictions for those seven years, all without incident. He stands convicted of conspiracy to engage in the unlicensed distribution of wholesale pharmaceuticals and is facing an advisory guidelines range of 0-6 months. He agrees with the Probation Office that no time in custody is warranted. Given that he has already been on supervision for the past seven years, Mr. Danielian requests that the Court order no probation, no further supervision, and no fine.

/ / /

Mr. Danielian grew up in Armenia. When he was 20 his family was forced to flee political persecution after the fall of the Soviet Union. PSR ¶ 96. He sought asylum in the United States and never returned to Armenia. He started a family to which he is deeply dedicated, as the letters submitted in his support show. *See*, *e.g.*, Exh. B, Kazaryan Letter ("The amount of time and effort he puts in on daily basis to get his kids to and from school and to their respective afterschool activities is unmatched … As a husband, he has always been there to support his wife as she has pursued her own successful career."); Koskarayan Letter ("In all my interactions, what has stood out is the dedicated, loving family man that he is."); Madoyan Letter ("Arman is one of the best family men I know.") In 2010, he opened Nuvo Pharmaceuticals, a wholesale pharmacy, which he operated for several years. Mr. Danielian then sold the company, and its new owner used it to conduct illegal activities. PSR ¶ 60. "There is no evidence or indication that, while it was under Danielian's control, Nuvo was anything other than a lawful business." *Id.*

In 2014, Mr. Danielian and dozens of others were charged in a sprawling indictment and accused of a host of offenses, including years-long membership in a racketeering enterprise, participation in racketeering activities that included "multiple acts and threats involving murder," conspiracies to commit identity theft, access device fraud, money laundering, and mail, wire, and bank fraud. But the government never disclosed any evidence that would support these charges. *See* Motion for Bill of Particulars (Dkt. 374), Opposition (Dkt. 456), and Reply (Dkt. 487). Indeed, the recording of Mr. Danielian's post-arrest interrogation suggests that the government mistakenly believed he was the one using Nuvo Pharmaceuticals to commit crimes:

Q: You're being arrested for prescription drug diversion.

A: Ok.

Q: We've developed an investigation that shows that Nuvo Pharmaceuticals was engaged in prescription drug diversion.

A: One more time?

Q: Nuvo Pharmaceuticals.

A: Oh. Wow. ... Nuvo Pharmaceutical, we sold it to – what was his name. Long time ago. I have nothing to do with Nuvo Pharmaceuticals.

Q: So – who did you sell it to and when did you sell it?

| | | |
|---|---|---|
| A: | I have the paperwork. I sold it two, three years ago. | |
| Q: | You sold it – you don't own it anymore? | |
| | … | |
| Q: | Obviously there's some confusion here, I'd be happy to explain where I think the confusion stems from. | |
| A: | Explain it. | |
| Q: | Okay, so can I explain it to you? Is it okay to continue to talk about this? | |
| A: | You can tell. You can talk. | |
| Q: | Alright. So we had you as the owner of the company. | |
| A: | I'm not the owner of the – | |
| Q: | In 2012, 2013 the company did a lot of bad stuff. | |
| A: | When? | |
| Q: | 2012, 2013 the company did a lot of bad stuff. | |
| A: | That's not me. | |

Mr. Danielian was telling the truth. He was not involved with the charged activity at Nuvo or at Niva Pharmaceuticals, a business he subsequently opened but sold without operating. *See* PSR ¶¶ 60-61 ("Danielian did not own Nuvo at the time of the illegal activities … [and] there is no indication that Danielian … was involved in any illegal conduct related to Niva[.]").

That is not to say Mr. Danielian committed no offense, but his illegal conduct was limited to the bare agreement to assist in opening a wholesale pharmacy without following certain regulations. This agreement was the result of the UC's approach to Mr. Danielian, not the other way around, and the sum total of Mr. Danielian's conspiratorial behavior occurred during three meetings in 2014. In those meetings, he discussed with the UC various aspects of the operation of wholesale pharmacies and how to circumvent certain regulatory requirements, such as having someone other than the pharmacy's actual owner take the "designative representative" examination and avoiding inspections. Mr. Danielian also suggested that, if the UC actually opened a wholesale pharmacy, he could work for the UC and receive a commission on sales of medication. After one such meeting, Mr. Danielian sent the UC the address of a website with

(legal) information on wholesale pharmacies and suggested a name for the UC's business. *See* Plea Agreement, ¶ 2. The business was never opened, and Mr. Danielian never worked with the UC or even met him again.

In an effort to accept responsibility and disentangle himself from this sprawling case, Mr. Danielian pled guilty to conspiracy to conduct unlicensed distribution of wholesale pharmaceuticals. But because the government chose to indict Mr. Danielian along with dozens of individuals whose conduct had absolutely nothing to do with him, it has taken seven years to reach sentencing. He has thus spent seven years under pretrial supervision with all the limitations on his employability and freedom of movement that such status entails.

Mr. Danielian sincerely acknowledges that his conduct was wrongful. He has learned a very painful lesson. As he writes to the Court, "I knew the agent was planning to break the law with his pharmaceutical business and I regret that I agreed to meet with him and discuss with him how to set up the business." Exh. A. The letters submitted to the Court attest to his regret. *See* Exh. B, Kazaryan Letter ("I have spent many hours talking with Arman about the situation… He felt so upset at himself making a bad judgement call"); Oganesyan Letter ("He has expressed a deep sense of remorse for his bad decisions."). But his actions are sufficiently punished by seven years under supervision.

While agreeing that Mr. Danielian should serve no time, the Probation Officer recommends three years of probation, which would bring the total time under supervision to ten years. There is nothing to be gained by this from a sentencing perspective. Ten years of supervision would constitute a sentence far "greater than necessary" to reflect the seriousness of his conduct or to serve as a deterrent to others, especially in light of Mr. Danielian's flawless conduct on pretrial release. 18 U.S.C. § 3553(a). It would also be more than necessary to deter him from future crimes. As the letters from his community demonstrate, there is no risk that he will be tempted to engage in similar conduct in the future. *See* Letters, Exh B; *see also* Danielian Letter ("I am very sorry for my actions, and I can assure you that I will stay as far away from things like this as I can in the future.").

The Probation Office also recommends a $2,500 fine. Mr. Danielian requests that the Court decline to impose it. As the PSR reflects, his net worth is negative, and while his monthly cash flow is positive, it is only barely so. PSR ¶ 115 (showing $115 net monthly income). Due to difficulties finding work during the pendency of this case, Mr. Danielian is unemployed and relies on his wife to financially support him and their two children. *Id.* at ¶ 98. He thus has no income, few resources, and his earning capacity has been severely eroded by his conviction here. *See* 18 U.S.C. § 3572(a) (courts are to consider "defendant's income, earning capacity, and financial resources"). There was no pecuniary loss here, no ill-gotten gains to recoup, and a fine would do nothing other than to burden this one-income family. *Id.* (requiring courts to consider "the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person … that would be responsible for the welfare of any person financially dependent on the defendant," whether there was "pecuniary loss inflicted upon others as a result of the offense," and "the need to deprive the defendant of illegally obtained gains"). More fundamentally, the same considerations govern imposition of a fine as determine the length of a sentence (*id.*), and a fine is not necessary to reflect the seriousness of Mr. Danielian's conduct, to deter him from committing further offenses, or otherwise to meet the statutory goals of sentencing.

      Accordingly, Mr. Danielian respectfully requests that the Court impose a sentence of time served, no fine, and no further supervision or probation.

Dated: April 29, 2022

                                                                                          /s/
                                         Mary McNamara
                                         August Gugelmann
                                         SWANSON & McNAMARA LLP
                                         Attorneys for Arman Danielian